**TRANSPORT OF NEW JERSEY, Plaintiff,**

v.

**GREYHOUND LINES, iNC., Defendant.**

**Civ. A. No. 78–2178.**

United States District Court, District of Columbia.

Jan. 11, 1979.

John R. Sims, Jr., Washington, D. C., for Transport of New Jersey.

L. C. Major, Jr., Alexandria, Va., for Greyhound Lines.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge.

This proceeding arises under the Interstate Commerce Act (Act), 49 U.S.C. § 301 *et seq.* Plaintiff Transport of New Jersey seeks an injunction restraining Greyhound Lines from offering specified bus transportation between the Philadelphia, Pennsylvania area and Atlantic City, New Jersey. The service was inaugurated by Greyhound on November 15, 1978. Transport alleges that Greyhound lacks the appropriate certificate of public convenience and necessity required by § 306(a) and its conduct is thus a "clear and patent violation" of the Act. This Court's jurisdiction is conferred under the provisions of § 322(b)(2).[1] Prior to instituting this proceeding, plaintiff filed a formal complaint against Greyhound with the Interstate Commerce Commission (Commission).[2] That complaint has not been acted on by the agency and an initial ruling is not expected within the next six months. However, in response to the Court's request the Commission filed an amicus memorandum in this case on December 7, 1978.

The plaintiff sought and was denied a temporary restraining order on November 17, 1978. It appearing that there were no material facts in dispute, the Court determined, with the parties' concurrence, that cross motions for summary judgment were appropriate. Such motions were filed and a hearing was held on December 8, 1978. After consideration of the legal memoranda and argument of counsel, and the Commission's amicus memorandum, the Court concludes that Transport of New Jersey is entitled to summary judgment and injunctive relief as a matter of law.

The material undisputed facts follow. Transport holds proper authority from the Commission to perform regular scheduled motor common carrier transportation of passengers between Philadelphia, Pennsylvania and Atlantic City, New Jersey. Service has been provided for more than 25 years and Transport now operates non-stop express buses in 23 daily regularly scheduled round trips from 4 locations in and around Philadelphia to Atlantic City. A round trip ticket costs $7.25.

Greyhound has a certificate of public convenience and necessity to transport passengers and their baggage over irregular routes, "in special operations, in round trip sightseeing or pleasure tours," between various points, and insofar as relevant here, including certain counties in the state of Pennsylvania and Atlantic City, New Jersey. On November 15, 1978, Greyhound began regularly scheduled, round trip twice daily transportation of passengers from 13

---

1. The sections of the Interstate Commerce Act at issue have been recodified pursuant to Public Law 95–473, Oct. 17, 1978, 92 Stat. 1337. The preamble to that Act points out that the legislative purpose was to revise and codify "without substantive change the Interstate Commerce Act and related laws . . . ."

Accordingly, for the sake of uniformity with the pleadings which generally refer to the former sections, the Court does so also.

2. *Transport of New Jersey, Complainant v. Greyhound Lines, Inc., Defendant*, Docket No. MC–C–10303, docketed November 30, 1978.

fixed locations in and around Philadelphia to the Resorts International Hotel Casino (Casino) in Atlantic City.[3] The defendant operates this service over three separate routes for a total of at least 6 buses a day Monday through Friday. Each trip includes a stay in Atlantic City from six to eight hours. Although advance seat reservations are available, the general public is not restricted and anyone may board a bus at any one of the 13 pick-up points on a first-come, first-serve basis. There is no group membership or affiliation requirement of any kind. The cost of the round trip ticket is $12.

At the Casino, Greyhound passengers are provided various amenities including immediate access to facilities, a meal or an evening theater performance if available, a booklet on gaming, and a color coded lapel button which affords full recognition by Casino representatives. These amenities are provided by and paid for in large part by the Casino.

In 1965, the Interstate Commerce Act was amended to permit any person injured by a "clear and patent violation" of certain sections of the Act, including § 306, to apply to a federal district court for injunctive relief under § 322(b)(2). Before the amendment, only the Commission could seek injunctive relief when a carrier operated without a certificate of public convenience and necessity. The House Report stated that the 1965 amendment of § 322(b) was intended

> to afford injured parties a measure of self-protection against operations which are openly and obviously unlawful. [T]he words "clear and patent" are used and are intended as a standard of jurisdiction

rather than as a measure of the required burden of proof. [1965] U.S.Code Cong. & Admin.News, Vol. 2, 2923, 2931.

Plaintiff relies upon this self-help provision, § 322(b)(2), and contends that Greyhound's bus operation between Philadelphia and Atlantic City is not authorized by its certificate and is in "clear and patent" violation of § 306(a). In response, Greyhound argues that the challenged service is a "special operation" round trip, sightseeing or pleasure tour specifically authorized by its certificate and, therefore, does not violate § 306(a).[4] Greyhound also contends that in any event its services are not in "clear and patent" violation of the section. The Court agrees with Transport and rejects the argument that the defendant's service is authorized under its limited certificate.

What constitutes a "special operation" in round trip, sightseeing or pleasure tours was discussed and considered fully in *Asbury Park-New York Transit Corp. v. Bingler Vacation Tours, Inc.*, 62 M.C.C. 731 (1954). At page 739 of that frequently cited opinion such service was defined as all passenger operations which are neither "ordinary day-to-day scheduled regular-route common carriage of passengers" nor "charter operations in which a group organized by someone other than the carrier is sold the exclusive use of a vehicle." The Commission noted in its discussion that round trip sightseeing or pleasure tours in special operations must include:

> something *substantial* in addition to, or different from, bare expeditious transportation between two points which factor is the fundamental characteristic of ordinary regular-route passenger-carrier service. Thus, if some *"substantial"* acces-

---

**3.** In reply to defendant's motion for summary judgment, Transport points out that in addition to its terminal-to-terminal operations between Philadelphia and Atlantic City, it also provides daily door-to-door service between 3 Philadelphia locations and Resorts International. *See* supplemental affidavit of Frederick J. Stephens filed with Transport's reply on December 4, 1978, p. 2.

**4.** Greyhound concedes that two of the 13 pick up points are not within the authorized origin

points of the certificate at issue in this case but contends that these two points, Willow Grove and King of Prussia, can be tacked via authorities held by Greyhound under other certificates to this authority. Greyhound has an application pending before the Commission for special operations over regular routes between Philadelphia and Atlantic City on an unrestricted basis, *i. e.*, not confined to sightseeing or pleasure tours.

sorial or different service is not provided the operation must be classed as that of an ordinary regular-route carrier. . . . When, however, a carrier holding tour authority on a "radial or territorial basis" undertakes to set up a tour of 1 day or less between 2 specific points it then becomes important that something extra and something *substantial* be added to the bare transportation involved. If regularity, frequency and expeditious service are introduced as additional factors in such point-to-point operation, then progressively it becomes even more important that these characteristics of an ordinary passenger operation not predominate in the service which is offered and provided to its patrons. (Emphasis added.)

*Id.* at 745–46.

Greyhound contends that the extras its passengers receive in connection with their transportation to the Casino are "substantial" and therefore meet the *Asbury Park* test. This Court does not agree with that position nor does the Commission in its amicus memorandum.[5] The *Asbury Park* ruling did not list the additional things a transportation service "must possess" to become a tour. However, the Commission did point out characteristics considered significant in earlier cases. One such case empha-

sized that the carrier conducted "a wide variety of extensive tours as well as 1-day tours," and placed considerable significance upon the presence of "the direct supervision of a tour conductor" in distinguishing special operations. Another noted that special tours included the cost of entrance fees and the services of guides to discuss the points of interest along the routes, such operations being designed "to meet the needs of sightseers and not . . . persons desiring expeditious transportation between points." Another tour included all necessary expenses such as transportation, meals, lodging, guides, excursions, and the like.

The main attraction of the Greyhound trip is not sightseeing, nor is it a meal, a lapel button or a gaming pamphlet; but rather direct, expeditious transportation to the Casino and its games of chance. The extras connected with the Greyhound trip, like the racetrack admission ticket in *Asbury Park*, are peripheral not substantial. Nor does Greyhound even pay for all of them. Resorts International pays for some.[6]

It should also be noted that Greyhound does not assemble passengers for its trips but merely picks them up at designated times and locations, that no tour director accompanies the bus or the passengers at

---

**5.** The Commission's amicus memorandum while noting its concern "not [to] be bound by any position advanced" and asserting that it would confront the matter on its merits in the agency complaint proceeding, MC–C–10103 (see note 2 *supra*), nonetheless states at page 8:

Since defendant appears to be operating a regularly scheduled, fixed route operation without bearing the financial burden of providing the non-transportation amenities, the Commission concludes that the pleadings demonstrate that Greyhound's operation is a "clear and patent" violation of its operating authority. . . .

[G]iven the circumstances of this case, plaintiff should not be denied the opportunity to demonstrate to this Court its entitlement to a grant of injunctive relief on the basis of the doctrine of primary jurisdiction or the pendency of any proceeding before the Commission.

The Commission expressed its strong belief that "whenever appropriate, the 'self-help' pro-

vision of 49 U.S.C. § 322(b)(2) should be permitted to run its course," noting that such approach "is consistent with the unique ability of extraordinary injunctive relief to avoid '. . . the undue delay that may result from the administrative decision-making process itself. . . .'"

**6.** Greyhound contended at oral argument that Transport and the Commission have misconstrued the *Asbury Park* case; that what is important about the extras provided is not whether the carrier pays for them but whether the passengers do. Yet Greyhound admitted that Resorts International pays for the extras supplied to the first 23 passengers of each busload; not until that level is reached does Greyhound have any financial obligation to Resorts International, at which point it is to pay the Casino 30 percent of the revenues collected based upon the total number of passengers transported to "help offset" the cost of those features made available by the Casino.

the Casino. Finally, and of special importance is the fact that Greyhound's service is provided regularly, Monday through Friday, over regular fixed routes despite its certificate's limitation to "irregular routes." The Commission has held that special service "contemplates that service rendered generally on week-ends, holidays, or other special occasions to a number of passengers which the carrier itself has assembled into a travel group . . . ." *Fordham Bus Corp. Common Carrier Application,* 29 M.C.C. 293, 297 (1941). Similarly in *Brown's Bus Service, Inc., Extension—Intermediate Points,* 83 M.C.C. 261, 265 (1960), the Commission found the proposed motor carrier operation a scheduled regular route operation not a special operation because "[a]pplicant will not assemble groups of passengers for special trips, nor will it operate on an irregular or sporadic basis; rather, it will operate over a fixed route and follow a regular daily schedule."

Still another factor in this case is the underlying rationale which the Commission gave for its decision in *Asbury Park,* namely, to prevent "direct and destructive" competition which would damage a company providing regular common carrier service upon which the public must depend for its day-to-day basic transportation. 62 M.C.C. at 746. There are thus three interests to be considered: the interest of the two contending parties and the interest of the general population in dependable, public transportation of the sort New Jersey Transport provides.

For the foregoing reasons, the Court concludes as a matter of law that the operations of defendant Greyhound are in clear and patent violation of § 306(a) and that Transport's motion for summary judgment should be granted and defendant's cross motion denied. In light of this disposition of the case, the Court need not rule on plaintiff's motion for preliminary injunction.[7]

ORDERED accordingly.

7. The Court also does not find it necessary to address plaintiff's argument raised at the summary judgment hearing that defendant has violated certain tariff provisions of the Interstate Commerce Act, 49 U.S.C. § 317(a) & (b). That argument was offered in the alternative in the event the Court did not find defendant's activities a "clear and patent" violation of § 306(a), which the Court has found.